J-S08002-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DARNELL DIXON | |
| Appellant | No. 148 WDA 2016 |

Appeal from the PCRA Order dated December 25, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0017215-2008

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and SOLANO, J.

MEMORANDUM BY SOLANO, J.:                    FILED NOVEMBER 21, 2017

Appellant Darnell Dixon appeals pro se from the order dismissing his first petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. We affirm.[1]

We adopt the facts as described by the trial court:

On November 8, 2008, Michael Ross was the owner and operator of a business known as CC&M Fashions located on Hodgkins Street in the Northside Section of the City of Pittsburgh. Ross sold t-shirts and other sports-related wearing apparel from the store; however, because his father and grandfather who had previously operated the store were robbed or attempted to be robbed on several occasions, Ross rarely kept more than sixty dollars on the premises and he also had a thirty-eight-caliber revolver in his desk drawer. Ross opened his store sometime

_____

[1] As we explain in the course of this memorandum, we initially issued a decision affirming the PCRA court's dismissal on May 25, 2017, on the ground that Appellant waived his claims by failing to respond to the PCRA court's notice of its intent to dismiss. On June 19, 2017, Appellant filed an application for reargument in which he explained that he did respond to that notice, but that his response was not docketed by the PCRA court. Accordingly, we granted Appellant's application for reargument and now once again consider his appeal.

between 11:30 a.m. and 12:00 p.m. and shortly thereafter, Ross' father came to the store and assisted him and was working in the back of the store, storing additional items that Ross had for sale.

Earlier on November 8, 2008, Ross had attempted to call his girlfriend, Christine Johnson. They had made numerous phone calls to each other; however, they had not been able to reach each other. At approximately 1:00 p.m., Ross and Johnson were finally able to reach each other on the telephone and were talking for several moments when she heard someone come into the store. Apparently Ross believed that he had disconnected the phone connection but he had not and Johnson was able to hear what was going on in the store. Johnson heard Ross say to someone who had come into to the store, "Take your hoodie off" and also heard the individual who came into the store say, "Give me your money". She then disconnected this conversation and called 911 to report a robbery that was taking place at Ross' business.

Fred Ross, who was working in the back of the store, knew that his son was on the phone and decided to deal with the inventory in the storage area. While he was working in the back of the store, he heard Michael Ross yell to him, "Dad, it's on". Fred Ross then came to the front of the store and partially obscured by several racks of clothing saw two young, black males come into the store, both of whom were dressed in black and had what appeared to be black masks on. Both of the men that Fred Ross saw were armed and one of the two was yelling at Michael Ross to "Give up the money". The two intruders were focused on Michael Ross and not Fred Ross and he was able to run out the front door and across the street to a Kuhn's Market where he had hoped to find a Pittsburgh Police Officer or security guard to assist him in the prevention of this robbery. Once he was outside of the store he heard several gunshots and turned to see the two intruders leaving the store and heading down toward Ingram Street. Fred Ross went into the store and saw Michael Ross lying on the floor and realized that there was nothing he could do for him.

Victoria Zuback, (hereinafter referred to as "Zuback"), was walking her dog along Ingram Street when she heard a series of gun shots. Shortly after hearing those gunshots, she heard the sound of footsteps approaching her and when she turned to look, she saw two individuals dressed in black, with black masks on.

The first individual went to a large SUV that was parked in front of a house and [she] saw that individual go to the rear of the vehicle, open the left rear door and appear to put something in the back, close the door and then get into the driver's seat. Shortly thereafter she heard another individual heading toward the SUV and saw that individual get into the front passenger seat and then saw the vehicle leave the scene.

Jamal El-Main, (hereinafter referred to as "El-Main"), was in his bedroom on the second floor of his home [on] Ingram Street and was about to change his clothes so he could go out and rake the leaves. When he was looking out his bedroom window, he noticed a large SUV parked in front of his house, which was parked in the wrong direction. El-Main went to his son's bedroom to get a better look at the vehicle and in looking out his son's bedroom window, he saw an individual all dressed in black reach the SUV, go to the back rear, open up the rear door and attempt to dispose of something. He then saw that individual get into the driver's seat. He also saw that there was someone else in the passenger seat and although he did not have a full view of them he was able to determine that there was someone there because he saw his legs. El-Main went down the stairs but by the time he got down the stairs, the SUV was gone. When he observed the driver of the SUV, he noticed that his hair was messed up like it had been braided and combed out and processed to relax it. El-Main then went out to rake his leaves and while he was doing this chore, he was approached by homicide detectives who were investigating the shooting at CC&M and told them what he had seen. When the homicide detectives asked him whether he could identify the van and the driver if he saw them again, he told them yes.

The killing of Michael Ross occurred . . . at approximately 1:15 p.m. At approximately 1:30 p.m., Pittsburgh homicide detectives received a phone call from the Mercy Hospital emergency room stating that they had a shooting victim in their emergency room that was being treated. Detectives were dispatched to Mercy Hospital to investigate that shooting and determined that individual who had been shot was [Appellant] and that he was currently in surgery for his gunshot wound. These homicide detectives also saw [Appellant's nephew,] Edward [Dixon ("Edward"),] in the emergency room. These detectives also noted a Chevrolet Yukon SUV with the driver's side and passenger side doors open and noticed that there was blood on the passenger seat area of that Yukon. They asked

Edward if he was the owner of the vehicle and he said that he was and they received consent from him to search that vehicle. In the rear of the vehicle, they found two black t-shirts tied up in a manner so as to permit them to be used as masks and they also found several white sports t-shirts. During the course of the inspection of the vehicle, it was noticed that the interior panel in the rear on the driver's side was loose and when that was removed a twenty-two caliber semi-automatic handgun was found.

Homicide detectives at the CC&M shooting and at Mercy Hospital were continuing to provide each other with information on what they believed to be two different shootings when it was suggested that El-Main be brought to Mercy Hospital to see if he might be able to identify the SUV and driver. El-Main was driven to Mercy Hospital and when he saw Edward, he immediately identified him as the driver of the SUV that was parked in the emergency area of Mercy Hospital.

Detective Robert Provident of the Pittsburgh Homicide Unit initially interviewed Edward at the emergency room at Mercy Hospital and Edward told him that his uncle had been shot in Swissvale and that he drove him to the nearest hospital that he knew. At the time that Detective Provident interviewed Edward, he did not know that Edward had been identified by El-Main as the driver of the SUV seen in connection with the CC&M shooting. Detective Provident transported Edward to the Homicide Division Headquarters so that he could be interviewed as a material witness. At the Homicide Headquarters, Detective Provident obtained biographical information about Edward and also obtained written consent forms to search his car and his house and Edward was given his Miranda warnings, both verbally and in writing and signed the Miranda rights form.

In his initial version of what transpired, Edward maintained that he was at home with his girlfriend when he received a phone call from his uncle asking for him to pick him up near McKeesport. Edward was traveling the Parkway East when he [exited] on the Edgewood Exit and as he approached Braddock Avenue, saw his uncle crouched down on the side of the road. He stopped his vehicle and his uncle got in and told him that he had been shot and then he turned around and headed toward Mercy Hospital. After a break, Detective Provident continued his interview and Edward said he was at [Appellant]'s home in the Woods Run Section of the City of Pittsburgh, which is located on the

Northside area of Pittsburgh. Eventually he gave his uncle a ride to a Shell gas station located at Hodgkins Street and Ingram when he received a phone call from his uncle to pick him up at the gas station and that his uncle was shot and to take him to the hospital.

Detective Provident took another break and then resumed his interview with Edward but this time, prior to asking Edward any questions, he advised him that there were potential witnesses who would identify him as being associated with the shooting that occurred at the CC&M Fashion store. Edward then told Detective Provident of his involvement in the shooting at CC&M Fashions. He stated that he had parked the SUV approximately one block from the store and before he got out of the vehicle, [Appellant] told him to put a black t-shirt on as a mask to cover up his face. [Appellant] went into the store first and had two guns and was pointing them at the clerk when Edward came into the store. [Appellant] then told him to get the clerk from behind the counter and to get some shirts. He then took one of the two revolvers from his uncle and ordered the clerk from behind the counter. While he was making these demands, [Appellant] was demanding that Michael Ross give him the money. While he [] held a gun on Michael Ross he heard Fred Ross in the back room and then saw him run past both of them and out the door. Michael Ross came from behind the counter and a physical encounter then began between Michael Ross and [Appellant], with both of these individuals firing their weapons at each other. Edward fired three shots into the floor in an attempt to scare Michael Ross and then ran out of the store. As he ran out of the store, he then handed his gun off to his uncle. When he was running down the street toward the SUV, he heard at least three or four more shots. As he got to the SUV his uncle joined him and they threw the shirts that his uncle had taken from the store, along with a gun in the back of the truck. Edward got into the driver's seat and [Appellant] got into the passenger seat and told Edward that he had been shot and take him to a hospital and [] not to a hospital on the Northside. As they were driving down Marshall Avenue, Appellant lowered the passenger window and threw out a handgun. Edward then drove from the Northside to Mercy Hospital located in the Uptown Section of the City of Pittsburgh. As they concluded their interview with him, Detective Provident asked Edward if he would give a taped statement and he agreed to do so.

On November 11, 2008, Detective James Magee went to Mercy Hospital, seeking to interview [Appellant]. Detective Magee was directed to [Appellant]'s attending physician and asked him whether or not [Appellant] was in any condition to be interviewed and was informed that he could be interviewed. Detective Magee then met [Appellant] in his hospital room and then told him the reason that he was there to interview him was about the circumstances of which he was shot on November 8, 2008. [Appellant] told him that he had met with two detectives the day before and they advised him that he was probably going to be charged with criminal homicide. Detective Magee told him that he was probably correct and then advised him of his Miranda rights. [Appellant] told Detective Magee that although he recalled going to CC&M Fashions, he did not recall where they parked the car. He remembered going into the store and then Michael Ross came from behind the counter with a gun in his hand and then he heard lots of people yelling at which time he ran out of the store back to the area where they had left the car. While running to the SUV, he had difficulty breathing and he realized he had been shot and told Edward to drive him to a hospital. After ten or fifteen minutes it became apparent that [Appellant] was experiencing some pain and the interview ceased. [Appellant] was discharged later that day from the hospital.

During the ongoing investigation in the CC&M Fashion shooting a thirty-two-caliber handgun was recovered from Marshall Avenue at the Route 65 Interchange. A review of the gun ownership records indicated that Fred Ross owned that firearm. . . . During the course of his initial investigation, Detective Provident was updated on the shooting that had occurred on the Northside and received information that there were two black males who had fled the scene in a tan SUV. Detective Provident took Edward back to Homicide Headquarters and after securing the consent form to search his car, he advised Edward of his Miranda rights since he was a possible suspect in the shooting that occurred in the Northside. Edward answered all of the questions of the Miranda form and signed that form. In addition he agreed to have a buccal swab taken from him for DNA investigation purposes. Initially Edward gave Detective Provident a statement that his uncle had been shot in another section of town and that his uncle called him to take him to the hospital. When Edward was confronted with the fact that he was a possible suspect in the shooting death of Michael Ross, he gave Detective Provident [] a statement of his involvement [in] that shooting and then

had that statement taped. At no time did Edward appear to be under the influence of alcohol or a controlled substance nor did he appear to be unable to understand the questions that were being asked of him[.]

Trial Ct. Op., 5/8/12, at 4-11, 24.

A criminal complaint was filed against Appellant on November 11, 2008, and trial was scheduled for April 27, 2009. On the scheduled trial date, Appellant obtained a postponement in light of his counsel's scheduling conflict. Trial was rescheduled for September 14, 2009, but on that date, the Commonwealth requested a postponement so that it could have more time to obtain DNA results, and the case was scheduled for February 22, 2010. PCRA Ct. Op., 8/8/16, at 18.

On September 17, 2009, Appellant filed a civil action against his trial counsel.[2] The docket for that action does not show that the complaint was ever served on trial counsel, and no evidence was ever presented that trial counsel was aware that such a lawsuit had been filed. PCRA Ct. Op., 8/8/16, at 13. Additionally, the docket for the civil suit states that the complaint was dismissed by court order on October 14, 2009. No attempt was made to reinstate that lawsuit or file another suit. Id.; see also Docket for Allegheny County Dkt. No. GD 2009-016073.

On February 11, 2010, Appellant asked to have his case severed from that of his co-defendant. Trial did not go forward on the scheduled trial date of February 22, 2010 because the trial court was involved in a death penalty

_____

[2] Allegheny County Docket Number GD 2009-016073.

case and unavailable. Accordingly, trial was rescheduled for May 10, 2010. After trial counsel requested a postponement to have additional time to review more than 60 hours of phone conversations provided by the Commonwealth, trial was rescheduled for October 18, 2010. PCRA Ct. Op., 8/8/16, at 18.

Appellant's jury trial was held from October 18 to October 25, 2010. During the trial, the jury heard testimony from Christine Johnson, Fred Ross, Justin Shipton, Victoria Zuback, and Jamal El-Main that corresponded to the facts outlined above. It also heard the following evidence:

> During the course of the initial investigation of the homicide scene, it was determined that three different weapons had been fired [] during this robbery. Shell casings and bullets were found from a twenty-two-caliber weapon and a thirty-eight-caliber weapon. A twenty-two-caliber weapon was found in the interior quarter panel of the SUV owned by Edward and the thirty-eight-caliber weapon was found at the Route 65 on ramp off of Marshall Avenue, not far from the shooting scene. This thirty-eight caliber was lawfully owned and registered to Fred Ross, the victim's father. The thirty-two-caliber weapon was never recovered. In addition to finding the twenty-two-caliber weapon in Edward's vehicle, there were several white t-shirts that had been taken from Michael Ross' business.

Trial Ct. Op., 5/8/12, at 14-15. In addition:

> Walter Lorenz testified as a Commonwealth expert that in his examination of the twenty-two caliber firearm he was able to determine that there was DNA on the grip that was consistent with [Appellant]'s profile and that the victim and co-defendant were excluded as contributors. . . . [T]here was a stipulation between the Commonwealth and [Appellant] that [Lorenz] had the expertise to render the opinions that he did with respect to the DNA sample. . . .
>
> The Commonwealth called Robert Levine, Ph[.D.,] to testify as to examination of the firearms and shell casing which were found

during the course of investigation of this homicide. Before Dr. Levine testified there was a stipulation between counsel that he was an expert in examining these firearms.

PCRA Ct. Op., 8/8/16, at 12, 23.

During the closing jury charge, the trial court gave the following instruction about reasonable doubt:

That presumption of innocence can be overcome if and only if you are individually and collectively convinced that the Commonwealth has met its burden by proving the elements of the offenses charged beyond a reasonable doubt.

A reasonable doubt has been defined as that which would cause you to pause or hesitate before doing something important in your own personal affairs. It must fairly arise from the evidence that's been presented or lack thereof.

The Commonwealth's burden is to prove its case beyond a reasonable doubt. It is not required to prove its case to a mathematical certainty or even to demonstrate the impossibility of innocence. It is only beyond a reasonable doubt.

If you look at that term grammatically, it may help you understand it a little bit better.

It is a noun modified by an adjective. You may have a doubt. The ultimate question, however, is whether or not that doubt is reasonable.

An example that I often use occurred a couple of summers ago when one of my sons came over to our house and asked me if I would follow him down to the car dealer because he wanted to drop his car off for inspection and he didn't want to stay there. I did. I brought him back to the house. We did a few things, and then he told me, as he does all too often, that he's hungry. So I made him lunch.

We got a call after the lunch. His car was ready and we could go back to pick it up. We got back in my car.

> While driving to the car dealership, he said: Did you turn off the stove? I had a doubt. I had a question. The ultimate question was whether or not I did. I worked through the process.
>
> When I thought about what had happened, then I said: Yes, I did. He said: Are you sure? Well, he wasn't anywhere near the stove, but I was. I said: Yes, I did.
>
> We drove to pick up his car. We came back to our house, and the first thing he did was go over to the stove. I didn't have to do that, because I knew what I had done. Initially I had a doubt. But ultimately I worked through the process, went back through the facts, and then made the determination that doubt was not reasonable.
>
> If you believe that the Commonwealth has met its burden of proving its case beyond a reasonable doubt, you would find the defendant guilty.
>
> If you believe that the Commonwealth has not met that burden, you must find the defendant not guilty.

N.T., 10/25/10, at 63-65.

Also during final jury instructions, the trial court explained murder of the second degree as follows:

> You would also consider the question of second degree murder. Second degree murder is described as felony murder. That is where a murder occurs during the commission of certain enumerated felonies.
>
> In order for you to find the defendant guilty of the crime of second degree murder, you must be satisfied that Michael Ross was killed; second, that the defendant did so while in the course of committing or attempting to commit a robbery; and third, that he was acting with malice.
>
> You may find that the defendant was acting with malice if you are satisfied beyond a reasonable doubt that he was engaged in the course of committing a robbery, and that is because robbery is a crime inherently dangerous to human life, and, therefore, does not require the proof of malice.

> When we talk about a robbery, you must be satisfied that the Commonwealth has proven beyond a reasonable doubt that the defendant inflicted serious bodily injury or death upon the victim and he did so during the course of the commission of a theft.
>
> When you talk about the commission of a theft means the taking unlawfully or control over personal property of another with the intent to deprive that individual of his property.
>
> If you believe that the Commonwealth has met that burden, then you would find the defendant guilty of the crime of second degree murder. If you believe that the Commonwealth has not met that burden, then you must find him not guilty.

N.T., 10/25/10, at 72-74.

On October 25, 2010, Appellant was convicted by a jury of murder of the second degree, robbery, carrying firearms without a license, and criminal conspiracy to commit robbery.[3] A separate firearms charge had been severed from the other four counts prior to the jury trial, and, following a bench trial, Appellant was also convicted of that crime.[4]

The court ordered a pre-sentence investigation report, and, on February 15, 2011, Appellant was sentenced to life imprisonment for second-degree murder, 10-20 years' imprisonment for robbery, and 10-20 years' imprisonment for criminal conspiracy, with the latter sentences to be served consecutively to each other and to the life imprisonment. He received no further penalty on the remaining counts.

_____

[3] 18 Pa.C.S. §§ 2502(b), 3701(a)(1)(i), 6106(a)(1), and 903, respectively.

[4] 18 Pa.C.S. § 6105(a)(2)(i).

On February 22, 2011, Appellant filed a timely post-sentence motion, and a hearing was held on June 20, 2011. At the conclusion of the hearing, the motion was denied.

On July 8, 2011, Appellant filed a timely notice of appeal to this Court. On December 28, 2012, we affirmed the convictions, vacated the judgment of sentence for robbery, and affirmed the judgment of sentence for the remaining convictions. Commonwealth v. Dixon, No. 1133 WDA 2011, at 1-2 (Pa. Super. Dec. 28, 2012) (unpublished memorandum). Appellant filed a petition for allowance of appeal to the Supreme Court of Pennsylvania, which was denied on October 9, 2013.

Appellant filed this timely pro se PCRA petition on March 3, 2014. On May 12, 2014, the PCRA court appointed Charles Pass III, Esquire, to represent Appellant. On June 2, 2014, Attorney Pass filed a Turner/Finley[5] letter with a memorandum and a request to withdraw as PCRA counsel. On July 7, 2014, the PCRA court granted Attorney Pass's request to withdraw and sent a notice to Appellant of its intention to dismiss his PCRA petition pursuant to Pa.R.Crim.P. 907(1). The PCRA court gave Appellant thirty days to file a response to this Rule 907 Notice.

On July 22, 2014, the PCRA court docketed Appellant's "Notice with Court Explaining How Defendant Wishes to Proceed," in which he stated that he would be proceeding pro se and "will be notifying this Honorable Court

_____

[5] Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988); Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988) (en banc).

why court-appointed counsel, Charles R. Pass, III should not be permitted to withdraw as counsel in regards to the above-entitled matter," even though Attorney Pass had already been allowed to withdraw by the PCRA court.

On September 21, 2014,[6] Appellant filed a pro se motion for leave to amend his PCRA petition, in which he stated that he wished to amend so he could add a claim that Attorney Pass "rendered ineffective assistance of counsel." On March 16, 2015, the PCRA court entered an order that appointed Alan R. Patterson III, Esquire, as Appellant's new PCRA counsel.[7] In that same order, the PCRA court stated the following regarding Appellant's motion for leave to amend his PCRA petition: "[t]he motion is returned to defendant for amendment as follows, such amendment to be made on or before, May 4, 2015, or counsel to advise that no amendment is necessary." The order thus directed Appellant's new counsel, Attorney Patterson, to review Appellant's proposed amendment and to decide whether it should be filed. Attorney Patterson never filed Appellant's proposed amended PCRA petition or any amended PCRA petition.

_____

[6] The certificate of service was dated September 21, 2014, and the court docketed the filing on September 30, 2014. See Commonwealth v. Whitehawk, 146 A.3d 266, 268 n.3 (Pa. Super. 2016) (under the "prisoner mailbox rule," a document is deemed filed when placed in the hands of prison authorities for mailing).

[7] We note that "Commonwealth v. Maple, 385 Pa. Super. 14, 559 A.2d 953 (1989), forbids appointment of new counsel where a proper Turner/Finley no-merit letter has been accepted and counsel was permitted to withdraw." Commonwealth v. Rykard, 55 A.3d 1177, 1183 n.1 (Pa. Super. 2012), appeal denied, 64 A.3d 631 (Pa. 2013). The PCRA court therefore erred in appointing Attorney Patterson. In light of our disposition of this appeal, we need not address that error.

On September 16, 2015, Attorney Patterson filed a Turner/Finley petition to withdraw as counsel, averring that he had analyzed Appellant's September 21, 2014 pro se petition to amend his PCRA petition and concluded that there were no meritorious issues. Pet. to Withdraw as Counsel under Turner & Finley, 9/16/15, at 1-2 (unpaginated). The PCRA court, "after reviewing that letter and the memorandum accompanying that letter," granted Attorney Patterson's petition to withdraw on October 26, 2015, and, on that same day, sent Appellant a notice of its intention to dismiss his PCRA petition. PCRA Ct. Op., 8/8/16, at 3. The court's order and notice stated:

> It is further ORDERED, ADJUDGED and DECREED that the Defendant must file a notice with th[e PCRA c]ourt within thirty (30) days of this Order, which will explain how he wishes to proceed. If no such notification is filed within thirty (30) days, the Court will enter a final Order dismissing the post-conviction petition.

Order, 10/26/15. On December 1, 2015, the PCRA court dismissed Appellant's PCRA petition. On December 25, 2015, Appellant filed a timely notice of appeal to this Court.

On May 25, 2017, this Court entered a memorandum decision holding that Appellant had failed to preserve any of his issues and affirming the order dismissing Appellant's PCRA petition. Commonwealth v. Dixon, No. 148 WDA 2016 (Pa. Super. May 25, 2017). We explained:

> Appellant had an opportunity to respond to Attorney Patterson's statements to the court, but he did not do so. In Commonwealth v. Rykard, 55 A.3d 1177 (Pa. Super. 2012), appeal denied, 64 A.3d 631 (Pa. 2013), this Court stated that

> "a petitioner waives issues of PCRA counsel's effectiveness regarding Turner/Finley requirements if he declines to respond to the PCRA court's notice of intent to dismiss." *Id.* at 1186 (citation omitted). Since Appellant did not file a response to the PCRA court's notice of intent to dismiss, he may not now challenge the correctness of Attorney Patterson's conclusion that there was no merit to any allegation that Attorney Pass was ineffective. Moreover, Appellant's failure to respond to the PCRA court's order of October 26, 2015, which notified Appellant of the court's intention to dismiss, waived not only Appellant's claims of ineffectiveness against Attorney Pass, but also those against Attorney Patterson. *See id.* at 1186.

*Id.* at 9-10. Thus, we held that all ineffective assistance of counsel claims against both Attorney Pass and Attorney Patterson were waived. *Id.* at 8-9.

On June 19, 2017, Appellant filed an application for reargument challenging our holding of waiver as to his ineffective assistance of counsel claims against Attorney Pass and Attorney Patterson. Appellant attached his "Objections to Petition to Withdraw as Counsel" ("Objections"), dated October 8, 2015, to his application for reargument.

According to the cash slips from the Department of Corrections date-stamped November 10, 2015, and attached to the Objections, Appellant served his Objections on the Honorable David R. Cashman and the Assistant District Attorney, but he never filed his Objections with the Allegheny County Department of Court Records. Thus, Appellant's Objections did not appear on the docket and were not in the certified record, which is why this Court had no knowledge of Appellant's Objections at the time it issued its earlier memorandum. Even though Appellant technically did not file his Objections, we choose not to find waiver of his challenges based on that fact, as both

the PCRA court and opposing counsel had timely notice of Appellant's Objections in November 2015.

Commonwealth v. Rykard, 55 A.3d 1177 (Pa. Super. 2012), appeal denied, 64 A.3d 631 (Pa. 2013), holds that "a petitioner waives issues of PCRA counsel's effectiveness regarding Turner/Finley requirements if he declines to respond to the PCRA court's notice of intent to dismiss." Rykard, 55 A.3d at 1186 (citation omitted). Appellant never actually responded to the second Rule 907 notice; he responded to Attorney Patterson's Turner/Finley petition. Accordingly, Appellant did not fulfill the Rykard requirement of responding "to the PCRA court's notice of intent to dismiss." Id. (emphasis added). For that reason, this Court could again conclude that issues regarding ineffectiveness of both of Appellant's PCRA counsel are waived.

However, Appellant's November 10, 2015 Objections appear to have been mailed to and received by the PCRA court after the court entered the second Rule 907 notice on October 26, 2015. By his Objections to Attorney Patterson's Turner/Finley petition, Appellant responded to Attorney Patterson's statements and thus preserved his claims alleging ineffective assistance of his PCRA counsel.[8] See Rykard, 55 A.3d at 1186. In light of that filing, this Court granted reargument on July 12, 2017. Accordingly, we

_____

[8] As we discuss below, the preservation was only as to the claims regarding Attorney Patterson, and not claims regarding Attorney Pass, since Appellant's Objections contain no statement of ineffectiveness regarding Attorney Pass.

will treat Appellant's November 10, 2015 Objections as if they were a response to the PCRA court's second Rule 907 notice, and we therefore do not find waiver under Rykard.

In his pro se appeal, Appellant raises the following issues, as stated in his brief:

I.      Whether in reviewing the [propriety] of the PCRA court's dismissal of Appellant's PCRA filing, it was an abuse of discretion for the PCRA court to accept the Turner/Finley "no-merit" letters filed by Appellant's PCRA counsels when those letters did not meet the standards set forth in Commonwealth v. Mosteller, 633 A.2d 615 (Pa.Super. 1993) in reference to the following sub-claims:

1.      Trial-Counsel was ineffective for failing to object to the addition of a firearms charge after the Preliminary Hearing;

2.      Trial Counsel was ineffective for faili[n]g to object to the DNA identification discovered on the firearm;

3.      Counsel was ineffective for failing to [undertake] a pre-Trial investigation as to whether or not the T-shirt produced at the time of Trial actually came from Ross-Store or was part of his inventory at the time of the crime;

4.      Trial Counsel was ineffective for failing []to object to the absence of the signature of the District Attorney on the Police Criminal Complaint filed in this matter - Pa.R.Crim.P. 504;

5.      Trial Counsel was ineffective for not seeking to wit[h]draw as Counsel once he found out that the Defendant had filed a civil suit against him;

6.      Trial Counsel was ineffective for failing to preserve the issue that a thorough inventory of the truck was not conducted;

7.      Trial Counsel was ineffective for failing to challenge the introduction of the twenty-two (22) caliber handgun

which he maintains was seen in the hands of his co-defendant;

8.     Trial Counsel was ineffective for failing to object to the prosecutor's argument that [Appellant] put the gun in the back of the co-defendant's truck as a stash spot;

9.     Trial Counsel was in[e]ffective for failing to conduct a pre-Trial investigation of the truck, fingerprints and back of the truck where the gun was placed since he believed that this investigation would have exonerated him;

10.     Appella[te] Counsel was [i]neffective for failing to raise the claims of the ineffectiveness of Trial Counsel on Direct-Appeal where the record was preserved;

11.     Trial Counsel was ineffective for failing to object to the Commonwealth's p[e]remptory strike [challenges];

12.     Trial Counsel was ineffective for failing to file a motion to Dismiss charge against him on a violation of his Rule 600 rights;

13.     Trial Counsel was ineffective in failing to object to the language employed by the Trial Court in defining reasonable doubt to the jury;

14.     Trial Counsel was ineffective in failing to object to the charge given to the jury on Second-degree Murder;

15.     Trial Counsel was ineffective in failing to investigate and to develop an adeq[ua]te Trial strategy;

16.     All Counsels from Trial Counsel through Appellate Counsel were ineffective for failing to raise the claims of ineffectiveness of Appellant's trial Counsel;

17.     Trial Counsel was ineffective in failing to obtain his own DNA expert.

18.     Trial Counsel was ineffective for not withdrawing from the case once he determined there was a conflict of interest since [Appellant] had filed a Civil suit against him;

19.   The Trial Court erred when it did not include [Appellant]'s first sentencing hearing where Trial Counsel was forced to withdraw from the case;

20.   Trial Counsel was ineffective in failing to object to the Trial Court's vouching to the expertise of a witness on behalf of the Commonwealth;

21.   There was a violation of the Brady Rule in that while Appellant was in the jail he had surgery to remove the bullet lodged in his back and he wanted the bullet to be presented into evidence maintaining that this bullet would demonstrate that he did not shoot the decease[d] Mr. Ross, b[e]cause it was the same caliber-bullet that inflicted the fatal wound to Mr. Ross.

22.   Violation of due process rights of Appellant in that he did not have transcripts of the proceedings at the time of the hearing on his petition for Post-Conviction Relief;

23.   The verdicts [a]gainst Appellant were a result of the cumulative errors previously presented.

II.    Whether the PCRA court erred and denied Appellant his federal and state constitutional rights to due process of law by dismissing Appellant's initial PCRA petition without an evidentiary hearing . . . where Appellant raised substantial questions of disputed facts regarding his conviction?

III.   Whether initial PCRA counsel rendered ineffective assistance . . . of counsel based on the filing of a Turner/Finley "no-merit" letter and this Honorable Court should disapprove the [PCRA] court's adoption of appointed PCRA counsels' Finley "no-merit" letter analysis and reasoning and remand this matter to the PCRA court for a proper Rule 1925(a) opinion in reference to the afore-mentioned claims of ineffective assistance of counsel?

Appellant's Brief at 4-6 (internal brackets and parentheses omitted).

Our standard of review of a PCRA court's denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the record evidence and free of legal error.  Commonwealth v. Wilson,

824 A.2d 331, 333 (Pa. Super. 2003) (en banc), appeal denied, 839 A.2d 352 (Pa. 2003).

We shall address Appellant's issues out of order, and, before turning to Appellant's lengthy list of reasons why Attorney Patterson should not have been permitted to withdraw and why the errors listed under Appellant's Issue I supposedly entitle Appellant to relief, we shall briefly discuss Appellant's second and third issues. Appellant's third issue refers only to a claim regarding Appellant's "initial PCRA counsel" – that is, Attorney Pass. See Appellant's Brief at 6 (emphasis added). However, Appellant's Objections (which we are treating as his response to the second Rule 907 notice) contain no statement that Attorney Pass was ineffective. For this reason, Appellant failed to preserve any issues regarding a claim of ineffectiveness by Attorney Pass, and he therefore may not obtain relief on his third issue.

Appellant's second issue, which challenges the PCRA court's dismissal of his PCRA petition without a hearing, is waived for a different reason: Appellant did not include that issue in his Rule 1925(b) Statement. An issue that is not included in a Rule 1925(b) statement cannot be raised for the first time on an appeal to this Court. See Pa.R.A.P. 302(a), 1925(b); Commonwealth v. Castillo, 888 A.2d 775, 780 (Pa. 2005) ("Any issues not raised in a Pa.R.A.P.1925(b) statement will be deemed waived"). Hence, we may not address this issue.

Having determined that Appellant is not entitled to relief on his second and third issues, we now turn to his first issue, which alleges various claims of error and asserts that Attorney Patterson should not have been permitted to withdraw because he erroneously concluded that these claims of error lack merit. Nineteen of the 23 sub-claims listed by Appellant under his Issue I allege ineffective assistance of counsel. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. See Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[T]he commanding intent of Strickland is to burden the defendant with the task of proving actual prejudice." Id. In this context, a finding of "prejudice" requires the petitioner to show "there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different." Commonwealth v. Stevens, 739 A.2d 507, 512 (Pa. 1999). If a petitioner fails to prove by a preponderance of the evidence any of the Pierce prongs, the court need not address the remaining prongs. Commonwealth v. Fitzgerald, 979 A.2d 908, 911 (Pa. Super. 2009), appeal denied, 990 A.2d 727 (Pa. 2010). Where "the underlying claim is meritless, the derivative claim of ineffective assistance of counsel for failing to object has no arguable merit." Commonwealth v. Spotz, 47 A.3d 63,

122 (Pa. 2012). Claims are deemed meritless where the assertions therein are not explained, developed, or supported by the record factually or legally. Id. at 108 n.34.

With this background, we turn to Appellant's list of errors.

### Failure to Object to Addition of a Firearms Charge
### (Sub-Claim 1)

Appellant's first sub-claim contends that Trial Counsel was ineffective for failing to object to the addition of a firearms offense to the criminal information, as this charge "was not in the Police Criminal Complaint." Appellant's Brief at 31. Appellant argues that trial counsel "had no reasonable basis for not challenging the absence of a hearing to determine whether the Commonwealth could present a prima facie case that Appellant committed one/or both of the firearms offenses charged, [and] Appellant was prejudiced by [trial counsel]'s inactions not challenging the absence of a hearing[.]" Id. at 31-32.

As Appellant fails to cite any applicable law in support of his contention, it does not merit relief.[9] Nor could Appellant obtain relief if we

_____

[9] See Spotz, 47 A.3d at 108 n.34 (claims are deemed meritless where the assertions therein are not explained, developed, or supported by the record factually or legally); In re Estate of Whitley, 50 A.3d 203, 209 (Pa. Super. 2012) ("[t]he argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities" (internal citations and quotation marks omitted)), appeal denied, 69 A.3d 603 (Pa. 2013); see also Lackner v. Glosser, 892 A.2d 21, 29-30 (Pa. Super. 2006) (explaining that appellant's arguments must adhere to rules of appellate procedure, and "arguments which are not appropriately developed are waived"; arguments not
(Footnote Continued Next Page)

were to consider this claim on the merits. The PCRA court stated that Appellant "was aware that a firearm was used in this homicide since the facts stated at the preliminary hearing indicated [Michael] Ross died as a result of the gunshot wounds that he received," and thus "[t]he addition of a gun charge following the preliminary hearing in no way prejudiced" Appellant. PCRA Ct. Op., 8/8/16, at 11-12. We agree with the trial court.

Criminal Rule of 564 governs amendment of a criminal information:

The court may allow an information to be amended when there is a defect in form, the description of the offense(s), the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

Pa.R.Crim.P. 564.

When the trial court exercises its discretionary power to allow amendment of the information, the defendant can obtain relief if the amendment prejudices him. Factors for a court to consider in determining the existence of prejudice include:

(1) whether the amendment changes the factual scenario supporting the charges; (2) whether the amendment adds new facts previously unknown to the defendant; (3) whether the entire factual scenario was developed during a preliminary hearing; (4) whether the description of the charges changed with the amendment; (5) whether a change in defense strategy was necessitated by the amendment; and (6) whether the timing of the Commonwealth's request for amendment allowed for ample notice and preparation.

(Footnote Continued) ————————————
appropriately developed include those where party has failed to cite any authority in support of contention).

Commonwealth v. Williams, 166 A.3d 460, 464 (Pa. Super. 2017) (citation omitted).

> The safeguards [governing the amendment of criminal informations] are intended to give the defendant adequate preparation time for trial without risk of last-minute additions to the charges which materially alter his defense. . . . In assessing the propriety of permitting a[n] amendment, [t]he courts of this Commonwealth employ the test of whether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct.

Commonwealth v. Mosley, 585 A.2d 1057, 1059–60 (Pa. Super. 1991) (en banc) (emphasis in original; internal brackets and citations omitted), appeal denied, 600 A.2d 952 (Pa. 1991); see also Commonwealth v. Stanley, 401 A.2d 1166, 1175 (Pa. Super. 1979) (if "the amended provision alleges a different set of events, or the elements or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted" (footnotes omitted)), aff'd, 446 A.2d 583 (Pa. 1982).

Here, as the PCRA court noted, Appellant already knew prior to the amendment to the information on January 20, 2009 — more than twenty months before his trial commenced — that he had been charged with committing a robbery and criminal homicide involving an unlicensed firearm which he was alleged to have carried. The factual situation that needed to be proven by the Commonwealth did not change with the addition of the

firearms charge; the Commonwealth did not allege a different set of events. Thus, the amendment did not require a change in Appellant's defense strategy, and Appellant therefore had adequate time to prepare his defense. See Mosley, 585 A.2d at 1059.

As Appellant's underlying claim is meritless, his derivative claim of ineffective assistance of counsel for failing to object has no arguable merit. See Spotz, 47 A.3d at 122.

### Failure to Object to DNA Identification
### (Sub-Claim 2)

Appellant next argues that "[t]rial [c]ounsel was ineffective for faili[n]g to object to the DNA identification discovered on the firearm." Appellant's Brief at 4. Appellant is referring to the testimony by Walter Lorenz, a Commonwealth expert, who stated that the DNA on the grip of the recovered twenty-two caliber semi-automatic handgun was consistent with Appellant's DNA profile and inconsistent with that of Michael Ross or the Co-Defendant. PCRA Ct. Op., 8/8/16, at 12. The PCRA court stated that "[t]he testimony with respect to this firearm showed an adequate chain of custody was maintained with respect to the collection and testing of the sample." Id. There was a stipulation between the Commonwealth and Appellant that Lorenz had the expertise to render the opinions that he did with respect to the DNA sample.

Appellant is unclear as to why he believes that trial counsel should have objected to the DNA identification. The only reference to this issue in

Appellant's brief to this Court is on page 32:

> the underlying claim of [trial counsel]'s ineffectiveness for failure to object to the identification of the DNA type discovered on the grip of a .22 caliber firearm has arguable merit and presents genuine issues concerning material fact, no reasonable basis exist[s] for [trial counsel]'s inactions, and Appellant suffered prejudice as a result of Counsel's error in his defense[.]

Appellant does not further explain why this claim is of "arguable merit" — he merely makes the bald assertion that it is so. Since this claim is not explained, developed, or supported by the record factually or legally, Appellant is not entitled to relief with respect to it. See Spotz, 47 A.3d at 108 n.34.

### Failure to Investigate T-Shirts
### (Sub-Claim 3)

Appellant's third sub-claim contends that trial counsel —

> was ineffective for failing to [undertake] a [pretrial] investigation as to whether or not the T-shirt[s] produced at the time of Trial actually came from [the business owned and operated by Michael Ross, which sold t-shirts and other sports-related wearing apparel] or was part of his inventory at the time of the crime.

Appellant's Brief at 4; see also id. at 18 ("Appellant raise[s] an issue of [t]rial [c]ounsel's ineffectiveness for failure to investigate [Appellant]'s case" (citing Commonwealth v. Mosteller, 633 A.2d 615 (Pa. Super. 1993)); Trial Ct. Op., 5/8/12, at 4.

The PCRA court asserted:

> The problem with this contention is that the determination that the t-shirt entered into evidence did not come from the inventory of [Michael] Ross' store would not provide any helpful or exculpatory information to [Appellant]. There was

- 26 -

identification of [Appellant] by several witnesses and there was his DNA on the murder weapon.

PCRA Ct. Op., 8/8/16, at 12.

We agree with the PCRA court that there is no indication that evidence regarding the origin of the white sports t-shirts found in the rear of the Co-Defendant's SUV would have resulted in a different outcome had trial counsel objected. See Trial Ct. Op., 5/8/12, at 7. The record supports the trial court's summary of the evidence sufficient to convict Appellant — the physical evidence of shell casings and bullets recovered from the scene and the testimony of five witnesses: Christine Johnson, Fred Ross, Victoria Zuback, Jamal El-Main, and Justin Shipton. Trial Ct. Op., 5/8/12, at 4-6, 14-15.[10] Hence, Appellant's third sub-claim is meritless.

Conflict of Interest
(Sub-Claims 5, 18)

Appellant's fifth and eighteenth sub-claims overlap, as they both address whether trial counsel had a conflict of interest and was thus ineffective for not petitioning to withdraw as Appellant's counsel. Appellant bases these claims on Martinez v. Ryan, 566 U.S. 1 (2012). See Appellant's Brief at 37.

_____

[10] Assuming trial counsel erred by not investigating, Appellant failed to establish a reasonable probability of a different outcome. The evidence of guilt was so overwhelming that any determination that the sports t-shirts at issue were not from Michael Ross' store would have been insignificant by comparison. As Appellant was not prejudiced by trial counsel's failure to investigate the origin of the t-shirts, he cannot establish one of the Pierce prongs and therefore has failed to demonstrate ineffective assistance of counsel. Pierce, 527 A.2d at 975; Fitzgerald, 979 A.2d at 911.

Martinez held that where, under state law, ineffective-assistance-of-trial-counsel claims must be raised in the initial collateral proceeding, a procedural default will not bar a federal habeas court from hearing those claims if, in that initial collateral proceeding, there was no counsel or counsel in that proceeding was ineffective. As Appellant is not pursuing a federal habeas claim, Martinez is inapplicable to the current PCRA petition. Commonwealth v. Robinson, 139 A.3d 178, 183-84, 187 (Pa. 2016); Commonwealth v. Brown, 143 A.3d 418, 420–21 (Pa. Super. 2016).

Additionally, the complaint in the underlying civil suit was never served on trial counsel, and there is no indication that trial counsel was even aware of the existence of this civil suit. PCRA Ct. Op., 8/8/16, at 13. The suit was dismissed less than a month after the complaint was filed, and there is no sign that Appellant ever attempted to reinstate the suit or to file a new one. Id.; see also Docket for Allegheny County Dkt. No. GD 2009-016073. As Appellant has failed to demonstrate that trial counsel knew of the suit, he likewise failed to demonstrate that a conflict of interest existed between himself and trial counsel.

Furthermore, Appellant has failed to explain how the alleged conflict of interest affected trial counsel's representation of him. See Appellant's Brief at 37. The PCRA court stated that trial counsel's "conduct in the trial of this case showed that he undertook to represent his client by the best possible means." PCRA Ct. Op., 8/8/16, at 13. Appellant's fifth and eighteenth sub-claims therefore fail.

### Failure to Raise Claims of Ineffective Assistance of Counsel
### (Sub-Claims 10, 16)

We advance to Appellant's tenth and sixteenth sub-claims, which contend that appellate counsel was ineffective for failing to raise claims of ineffective assistance of trial counsel on direct appeal. Appellant's Brief at 4-5 ¶¶ 10, 16 & at 33, 36-37.[11] As the PCRA court noted, PCRA Ct. Op., 8/8/16, at 15, claims of ineffective assistance of counsel are to be deferred to PCRA review. Commonwealth v. Holmes, 79 A.3d 562, 576 (Pa. 2013). Thus, in the current case, appellate counsel cannot be deemed ineffective for failing to raise claims of ineffective assistance of trial counsel, when such claims could not be raised at that time.[12] Hence, Appellant's tenth and sixteenth sub-claims are meritless.

### Failure to Object to Commonwealth's Peremptory Strikes
### (Sub-Claim 11)

In his eleventh sub-claim, Appellant contends that "trial counsel rendered ineffective assistance of counsel for failure to make a contemporaneous objection to the prosecutor's [peremptory] strikes." Appellant's Brief at 23-24, 34; see also id. at 5 ¶ 11.[13] Appellant adds that

---

[11] The sixteenth claim also asserts that trial counsel was ineffective in raising his own ineffectiveness. This claim has the same lack of merit as the claim against appellate counsel.

[12] Appellant does not assert any of the narrow exceptions that would allow assertion of an ineffective assistance of counsel claim on direct review. See Appellant's Brief at 33, 36-37; Holmes, 79 A.3d at 577-78.

[13] Appellant labels this his twelfth claim, although in the list of questions presented, it is his eleventh claim. Hereinafter, our numbering of Appellant's
(Footnote Continued Next Page)

"the underlying claim has arguable merit under Batson v. Kentucky, 476 U.S. 79 (1986)." Id. at 24.

In Batson, the United States Supreme Court "upheld the constitutional limitations on a prosecutor's use of peremptory challenges to purposely exclude members of a defendant's race from participating as jurors." Commonwealth v. Dinwiddle, 542 A.2d 102, 104 (Pa. Super. 1998), aff'd, 601 A.2d 1216 (Pa. 1992). As the Pennsylvania Supreme Court explained in Commonwealth v. Johnson, 139 A.3d 1257 (Pa. 2016):

> In Batson, the United States Supreme Court established a three-part inquiry to evaluate claims that a prosecutor engaged in racial discrimination during jury selection. First, a defendant must make a prima facie demonstration that the prosecutor exercised peremptory challenges upon the basis of race. Second, the burden then shifts to the prosecutor to articulate a race-neutral explanation for striking the particular juror. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 96–98[.]

Id. at 1282. In order to establish the first prong, "The defendant first must show that he [or she] is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Batson, 476 U.S. at 96 (internal citation omitted).

Appellant is a black male. Trial Ct. Op., 5/8/12, at 5. There is no evidence in the certified record of the racial profile of the venirepersons against whom the Commonwealth used its preemptory strikes. The absence

(Footnote Continued) ————————————

sub-claims will continue to reflect their enumeration in his Statement of Questions Involved.

of this evidence, which is essential for proof of Appellant's claim, precludes recovery by Appellant on this issue.

The PCRA court represents that the Commonwealth's preemptory challenges were used against a black venireperson, two white venirepersons, and a fourth venireperson whose race was not identified. PCRA Ct. Op., 8/8/16, at 15. Appellant does not contradict the PCRA court's description of the stricken venirepersons. Thus, even if we accept the PCRA court's representation of the missing evidence, Appellant still could not establish an improper pattern of purposeful exclusion of members of Appellant's race, given that at least half of those removed were of a different race. See Dinwiddle, 542 A.2d at 104. Hence, a Batson challenge is insupportable, and trial counsel cannot be considered ineffective for failing to make a meritless objection. See Spotz, 47 A.3d at 122. Therefore, Appellant's eleventh sub-claim fails.

### Rule 600
### (Sub-Claim 12)

Appellant next claims that "[t]rial [c]ounsel was ineffective for failing to file a motion to Dismiss charge against him on a violation of his Rule 600 rights." Appellant's Brief at 5 ¶ 12, 12 ¶ 12 (identical language). However, Appellant fails to cite any legal authority or to present any developed argument to support this sub-claim, and he does not state which subsection of Pa.R.Crim.P. 600 he believes applies to his case. He therefore waived this

twelfth sub-claim. See Commonwealth v. Perez, 93 A.3d 829, 841 (Pa. 2014), cert. denied, 135 S. Ct. 480 (2014).

If Appellant had preserved this issue, we would agree with the PCRA court's calculations and conclusion:

> A defendant's right to a speedy trial is codified in Rule 600 of the Pennsylvania Rules of Criminal Procedure . . . A total of seven hundred seven days elapsed between the filing of the complaint and the commencement of trial. In calculating a defendant's Rule 600 rights, one must also consider excludable and excusable time. There are three hundred seven days of excludable time based upon the requests by [Appellant] to have his case continued and at least one hundred sixty days of excusable time based upon the unavailability of th[e trial c]ourt to try this case and a combined four hundred sixty-one days of excludable and excusable time demonstrate that there was no violation of [Appellant]'s speedy trial rights under Rule 600 of the Pennsylvania Rules of Criminal Procedure.

PCRA Ct. Op., 8/8/16, at 15-16, 19 (some formatting altered).

## Failure to Object to Charge on Reasonable Doubt
### (Sub-Claim 13)

Appellant's thirteenth sub-claim states, in its entirety:

> Trial counsel rendered ineffective assistance of counsel for failure to object and preserve the issue of the trial court's instruction on reasonable doubt[. T]he underlying claim has arguable merit under Commonwealth v. [Ramos], 2007 PA Super. [335], 936 A.2d 1097, 1100 (Pa. Super. 2007), and presents genuine issues concerning material fact, [trial counsel] had no reasonable basis for not challenging this claim, and there was prejudice to Appellant's strategy and defense at Trial. . . . Trial counse[l] rendered ineffective assistance of counsel for failure to object and preserve the issue of the trial court's instruction on reasonable doubt the underlying claim has arguable merit under Victor v. Nebraska, 511 U.S. 1, 20, 114 S.Ct. 1239, 1250 (1994), and presents genuine issues concerning material fact, [trial counsel] had no reasonable basis for not challenging this claim, and there was prejudice to Appellant's strategy and defense at Trial.

Appellant's Brief at 24-25.[14]   Contrary to Appellant's argument, Commonwealth v. Ramos, 936 A.2d 1097 (Pa. Super. 2007) (en banc), appeal denied, 948 A.2d 803 (Pa. 2008), does not address jury instructions about reasonable doubt.

Victor v. Nebraska, 511 U.S. 1 (1994),[15] was decided together with Sandoval v. California.  In its opinion, the U.S. Supreme Court described those two cases as follows:

> The jury in Sandoval's case was given the following instruction on the government's burden of proof:
>
> > "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.
> >
> > "Reasonable doubt is defined as follows:  It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

---

[14] In addressing this issue, the PCRA court focused on the fact that Appellant had maintained in his PCRA petition that the trial court had allegedly "inserted the word 'pause' in its definition [of reasonable doubt] and that his counsel should have objected to the use of that word."  PCRA Ct. Op., 8/8/16, at 19.  Appellant makes no such argument about the word "pause" in his brief to this Court.

[15] Appellant's argument regarding Victor was included in Appellant's PCRA petition, under "Supplemental Issue 14."

* * *

At Victor's trial, the judge instructed the jury that "[t]he burden is always on the State to prove beyond a reasonable doubt all of the material elements of the crime charged, and this burden never shifts." The charge continued:

> "'Reasonable doubt' is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture."

Id. at 7, 18 (emphasis in original; citations to record omitted).

The Court held in Victor that neither of these instructions defining "reasonable doubt" violated the due process clause, and it contrasted the charges before it with a charge that it disapproved in Cage v. Louisiana, 498 U.S. 39 (1990) (per curiam).

> In only one case have we held that a definition of reasonable doubt violated the Due Process Clause. Cage v. Louisiana . . . . There, the jurors were told:
>
> > "'A reasonable doubt is one that is founded upon a real tangible substantial basis and not upon mere caprice and

- 34 -

conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.' " Id., at 40, 111 S.Ct., at 329 (emphasis added by this Court in Cage ).

We held that the highlighted portions of the instruction rendered it unconstitutional:

"It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Id., at 41, 111 S.Ct., at 329.

Victor, 511 U.S. at 5–6 (brackets omitted).

None of the challenged language in the Sandoval, Victor, or Cage jury instructions appears in the instruction given at Appellant's trial. N.T., 10/25/10, at 63-65. Thus, those decisions cannot serve as the basis for a challenge to the instruction at Appellant's trial.[16] As the underlying sub-claim is meritless, "the derivative claim of ineffective assistance of counsel for failing to object has no arguable merit." Spotz, 47 A.3d at 122.

_____

[16] Appellant's does not challenge use of any specific language in the trial court's charge. See Appellant's Brief at 24-25. He therefore has waived any more specific claim relating to the charge. We caution the PCRA court, however, that a charge equating reasonable doubt to a judge's personal experiences may raise questions that we do not reach here.

### Failure to Object to Charge on Second-Degree Murder
### (Sub-Claim 14)

Appellant's fourteenth sub-claim is that, "Trial Counsel was ineffective in failing to object to the charge given to the jury on Second-degree Murder." Appellant's Brief at 5 ¶ 14. He contends:

> At the conclusion of the evidence the [t]rial [court] instru[c]ted [the j]ury that the Commonwealth must prove that the killing was done in the course of committing a [r]obbery. However, the Judge did not tell the [j]ury that the prosecution had to prove that the killing had to be done "in furtherance" of the [r]obbery in order for the killing to rise to the level of Second-degree Murder. Since that instruction was never given, Appellant's conviction for Murder in the Second-degree cannot stand because Trial Counsel's error in not asking for the proper instruction was of constitutional dimen[s]ion. Strickland v. Washington, 466 U.S. 668, 687 (1984).
>
> Under Pennsylvania law, a killing can rise to the level of Second-degree Murder if it is committed "in the perpetration of a Robbery." This requirement can be particularly problematic when the individual who is charged with the Murder is not the actual slayer. There must be a sufficient nexus between the killing and the felonious act justifying imposing vicarious liability for the killing upon one who though not the killer was nevertheless involved in the underlying felony. See Commonwealth v. Waters 418 A.2d 312, 315 (Pa. 1980), Commonwealth v. Olds, 469 A.2d 1072, 1076-77 (Pa.Super. 1984) (citing Commonwealth v. Redline, 137 A.2d 472 (Pa. 1958)[)], see also Commonwealth ex rel. Smith v. Myers, 261 A.2d 550, 555 (Pa. 1970).

Appellant's Brief at 22 (parentheses and unnecessary punctuation omitted), 25.

The PCRA court's entire response to Appellant's challenge to the jury instruction on second degree murder is: "In reviewing this charge, it is abundantly clear that the charge to the jury was correct on the elements of

second degree murder, and that charge was consistent with the standard jury instruction on the issue of second degree murder." PCRA Ct. Op., 8/8/16, at 20-21.

The trial court instructed the jury that murder of the second degree "is where a murder occurs during the commission of certain enumerated felonies." N.T., 10/25/10, at 72-73 (emphasis added). It continued:

> In order for you to find the defendant guilty of the crime of second degree murder, you must be satisfied that Michael Ross was killed; second, that the defendant did so while in the course of committing or attempting to commit a robbery; and third, that he was acting with malice.

Id. at 73 (emphasis added).

In Commonwealth v. Munchinski, 585 A.2d 471, 482 (Pa. Super. 1990), appeal denied, 600 A.2d 535 (Pa. 1991), the appellant challenged a charge on second degree murder. In response, we explained:

> The constituent element of second degree murder is the killing of a person in the course of committing a felony. . . . What is required is that the actor be found guilty of a homicide in the progress of committing a felony with sufficient evidence to establish a felony was in process and the killing occurred.

Id. at 483 (emphasis added). Here, the trial court's jury charge for murder of the second degree used the same language as in Munchinski — "in the course of committing." N.T., 10/25/10, at 73. Also, we note that Commonwealth v. Tolbert, 670 A.2d 1172, 1179 (Pa. Super. 1995), appeal denied, 693 A.2d 588 (Pa. 1997), cert. denied, 522 U.S. 891 (1997), defines second-degree murder as "the killing of another with malice

- 37 -

during the commission of a felony" (emphasis added), thereby reflecting other language used by the trial court in this case.

Appellant's reliance on Commonwealth v. Waters, 418 A.2d 312 (Pa. 1980), is misplaced. Waters was an accomplice in the commission a felony; his co-defendant's act caused the victim's death. Id. at 316. This Court explained this distinction in greater detail in Commonwealth v. Mease, 516 A.2d 24, 26-27 (Pa. Super. 1986), appeal denied, 531 A.2d 428 (Pa. 1987):

> [In Waters,] the issue was accomplice liability for a killing committed during the perpetration of a burglary. The Supreme Court held that the accomplice, who had not fired the fatal bullet, was entitled to a jury instruction that to be found guilty of murder of the second degree there would have to be proof "of a conspiratorial design by the slayer and the others to commit the underlying felony and of an act by the slayer causing death which was in furtherance of the felony." . . . 418 A.2d at 317 (emphasis in original) (footnote omitted). In the instant case, Mease was the slayer and not merely an accomplice, and it was enough that the evidence showed that he had killed his victim while engaged in committing the crime of kidnapping.

Similarly to Mease, in the current action the Commonwealth's theory always was that Appellant was the slayer and not merely an accomplice.[17] The co-defendant gave a statement that Appellant fired his weapon at the victim, and only Appellant's DNA was found on the grip of the firearm that killed the victim. Trial Ct. Op., 5/8/12, at 9; PCRA Ct. Op., 8/8/16, at 12. Hence, "it was enough that the evidence showed that he had killed his victim while

_____

[17] In contrast to other arguments in his brief, Appellant's argument on this sub-claim does not assert that he was an accomplice and not the shooter. Compare Appellant's Brief at 4 ¶ 14 & 22 with id. at 4 ¶ 7 & 20-21.

engaged in committing the crime" of robbery. Mease, 516 A.2d at 27. Appellant's reliance on Commonwealth v. Olds, 469 A.2d 1072 (Pa. Super. 1983), is inapt for this same reason. See id. at 1075 ("there [was] no evidence that appellant participated directly in . . . the murder," so "the validity of [his] convictions depend[ed] upon his responsibility for acts done in furtherance of an alleged conspiracy").

Because any objection to the trial court's instruction thus would have been meritless, counsel cannot be considered ineffective for failing to raise it. Spotz, 47 A.3d at 122.

### Failure to Investigate and Develop Trial Strategy
### (Sub-Claim 15)

Appellant's fifteenth sub-claim is that trial counsel "was ineffective in failing to investigate and to develop an adeq[ua]te Trial strategy." Appellant's Brief 5 ¶ 15. "Appellant asserted that Trial Counsel was unprepared for Trial and sabotaged his case by giving many different theories of what happened instead of sticking with the truth while the Commonwealth used different theories against Appellant during Closing Arguments." Id. at 18.

The PCRA court rebutted:

This claim, however, is refuted by the record. His [trial counsel] knew that the evidence that was going to be presented by the Commonwealth would place [Appellant] and . . . the co-defendant, at the scene of the homicide. It was also clear that [Appellant] was shot at Ross' store and was driven by his [nephew] to the hospital where he was treated. It was also evident that he had given multiple, conflicting statements about his whereabouts and involvement to the police and that his

[nephew] had also given multiple and conflicting statements about what they were doing at the time the homicide occurred. There was the fact that the DNA evidence was on the murder weapon and that that DNA evidence established that it was [Appellant]'s DNA on that murder weapon. The record in this case clearly shows that [trial counsel] was prepared and attempted to defend [Appellant] in the best possible manner in spite of the overwhelming evidence against him.

PCRA Ct. Op., 8/8/16, at 21.

We note that elsewhere in Appellant's Brief, he acknowledges that trial counsel did develop a trial strategy — specifically, that trial counsel's "trial strategy was that his Client was in the Store, during the course of time he became caught up in the middle of a shoot-out." Appellant's Brief at 23, 35 (citing N.T., 10/18/10, at 55). In this connection —

Th[e Supreme] Court [of Pennsylvania] has previously held PCRA hearings are not discovery expeditions, but are conducted when necessary to offer the petitioner an opportunity to prove his explicit assertion of ineffectiveness raising a colorable claim about which there remains an issue of material fact. Commonwealth v. Sneed, 616 Pa. 1, 45 A.3d 1096, 1107 (2012). Particularly when PCRA claims require examination of trial strategy, it is not enough to take a cold record, state alternative choices counsel could have made, and then declare an entitlement to relief. Id. Mere conclusory allegations, without some proffer as to what counsel would say in response to the allegations are insufficient to establish entitlement to relief. Id. Thus a supporting document from counsel stating his reasons for the course chosen is generally necessary to establish potential entitlement to a hearing. Id. See, e.g., Pa.R.Crim.P. 902(A)(12)(b) (PCRA petition shall contain facts supporting each ground for relief; if supporting facts do not appear of record "affidavits, documents and other evidence showing such facts" to be identified).

Commonwealth v. Cousar, 154 A.3d 287, 299–300 (Pa. 2017) (emphasis added). Here, Appellant did not attach any sort of supporting document

from trial counsel "stating his reason for the course chosen[.]"

Appellant also makes the bald assertion that "there was prejudice to Appellant's strategy and defense at Trial." Appellant's Brief at 25, 37. However, he does not articulate what prejudice he suffered as a result of trial counsel's actions or lack thereof, see id., and "Strickland prejudice is not proved by such conclusory characterizations[.]" Cousar, 154 A.3d at 309.

For these reasons, Appellant's challenge that trial counsel failed to investigate and to develop an adequate trial strategy does not merit relief.

### Failure to Produce
### Bullet Removed from Appellant's Back
### (Sub-Claim 21)

For his twenty-first claim, Appellant contends that he was shot in the back during the robbery and a bullet lodged in his back. Appellant's Brief at 20. He continues:

> Claim 21.- violation of <u>Brady</u> Rule,[18] the exculpatory evidence from the jury, by failure to [produce the] bullet lodged in suppression of Appellant's back. The infirmary Staff Doctor Patterson in . . . Allegheny County Prison turned over the bullet Appellant was shot with to the District Attorney's Office, once surgical Doctors came in from the outside Hospital and removed the bullet out of [Appellant's] back. By failure to disclose the bullet this was suppression of exculpatory evidence by the Commonwealth from the jury.
>
> Doctor Levine testified as a[n] expert witness in firearms (N.T. 10/22/10, [at] 257[]-279) that he examined a .22 long caliber

_____

18 Under Brady v. Maryland, 373 U.S. 83, 87-88 (1963), "suppression by prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution."

Ruger with a Serial Number 213-38048, discharged the .22 caliber cartridges and a number of .22 caliber bullets, .22 caliber bullets were removed from the post-mort[e]m examination of the decedent Michael Ross, Appellant contends he was shot in the back with a .22 caliber bullet which establishes that he was not the actual Killer of the decedent as the Commonwealth argued to the Jury.

Appellant's Brief at 20-21.

The PCRA court stated: "This particular claim is nonsensical. The fact that a bullet was removed from [Appellant's] body in no way exonerates him from the killing of [Michael] Ross." PCRA Ct. Op., 8/8/16, at 23.

"To establish a Brady violation, [A]ppellant must demonstrate that: (1) the prosecution concealed evidence; (2) the evidence was either exculpatory or impeachment evidence favorable to him; and (3) he was prejudiced." Commonwealth v. Treiber, 121 A.3d 435, 460–61 (Pa. 2015). Appellant failed to meet these requirements.

First, Appellant failed to demonstrate that "the prosecution concealed evidence." See Treiber, 121 A.3d at 460. Appellant clearly knew that he had a bullet surgically removed, without having to be told so by the Commonwealth. Second, Appellant also failed to show that the allegedly concealed evidence was exculpatory. See id. at 461. "Exculpatory evidence is that which extrinsically tends to establish defendant's innocence of the crimes charged." Commonwealth v. Lisa Lambert, 765 A.2d 306, 325 n.15 (Pa. Super. 2000). "Brady does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses." Commonwealth v. Roney, 79 A.3d

- 42 -

595, 608 (Pa. 2013) (citations and internal quotations omitted). Here, the twenty-two-caliber bullet removed from Appellant's back is actually inculpatory, because it confirms Appellant's presence at the scene of the crime. Assuming, for argument's sake, that additional information about the removed bullet could have laid the groundwork for possible arguments or defenses, Brady does not require the disclosure of such information. Roney, 79 A.3d at 608. In addition, Appellant fails to explain how he was prejudiced. See Treiber, 121 A.3d at 461. Hence, Appellant has not established any of the three required prongs to support a Brady claim. His twenty-first sub-claim thereby collapses.

### Remaining Non-Cumulative Claims of Error
### (Sub-Claims 4, 6, 7, 8, 9, 17, 19, 20, 22)

Appellant is entitled to no relief on his remaining claims, because his brief does not develop them. Appellant's fourth, sixth, seventh, eighth, and ninth sub-claims are vague and undeveloped ineffective assistance of counsel claims. See Appellant's Brief at 32-33. Because these claims are not explained, developed, or supported by the record factually or legally, Appellant has not established he is entitled to relief on any of these claims. See Spotz, 47 A.3d at 108 n.34.[19]

The result is the same for Appellant's seventeenth, nineteenth, twentieth, and twenty-second sub-claims. Appellant proffers no argument in

_____

[19] Assuming that these claims were explained, developed, and supported, we would agree with the PCRA court's analysis for each issue. See PCRA Ct. Op., 8/8/16, at 12-15.

his brief or in his reply brief to this Court in support of these claims. See Appellant's Brief at 11-39; Appellant's Reply Brief at 2-6.[20] Beyond baldly enumerating these issues in his Statement of Questions Involved and copying identical language from his PCRA petition and amended PCRA petition, he does discuss these issues at all.[21] See Appellant's Brief at 5, 13-16. If an issue raised on appeal is too undeveloped for the court to identify and address it, then it is waived. See Commonwealth v. Reeves, 907 A.2d 1, 2 (Pa. Super. 2006), appeal denied, 919 A.2d 956 (Pa. 2007); Commonwealth v. Butler, 756 A.2d 55, 57 (Pa. Super. 2000) (when a court "has to guess what issues an appellant is appealing, that is not enough for meaningful review" (citation omitted)), aff'd, 812 A.2d 631 (Pa. 2002). We conclude that, as we cannot discern the nature of these sub-claims, we cannot provide meaningful review, and these sub-claims therefore are waived.

### Cumulative Errors
### (Sub-Claim 23)

Appellant's final sub-claim is that the "verdicts [a]gainst Appellant were a result of the cumulative errors previously presented." Appellant's Brief at 5 ¶ 23. Appellant does not develop this contention.

_____

[20] For his nineteenth sub-claim, Appellant writes: "Conflict of interest between a Client and his Attorney, review of specific Notes of Testimony are irrelevant to this issue." Appellant's Brief at 19. Appellant has not elaborated on his assertion and thus we cannot ascertain what he means or whether he is entitled to relief.

[21] Appellant's PCRA petition and amended PCRA petition do not include any argument for these claims.

The PCRA court stated:

This particular claim is predicated upon the cumulative effect of all of the alleged errors asserted by [Appellant]. Since none of those claims have any merit, he could not be subject to a cumulative error claim.

PCRA Ct. Op., 8/8/16, at 24.

In Spotz, the Court stated:

[The Supreme Court of Pennsylvania has] often held that no number of failed claims may collectively warrant relief if they fail to do so individually. However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed.

However, while cumulative prejudice may properly be assessed with respect to individual claims that have failed due to lack of prejudice, nothing in our precedent relieves an appellant who claims cumulative prejudice from setting forth a specific, reasoned, and legally and factually supported argument for the claim. A bald averment of cumulative prejudice does not constitute a claim. Appellant has set forth no reviewable claim, and he is entitled to no relief.

47 A.3d at 129 (internal brackets, citations, and quotation marks omitted); see also Commonwealth v. Bryant, 855 A.2d 726, 751 (Pa. 2004) ("No number of failed claims may collectively attain merit if they could not do so individually" (brackets and citation omitted)).

We have held in this memorandum that Appellant has not raised any claims that entitle him to relief. Although we concluded that Appellant's claim regarding investigation of the origin of the T-shirts fails mainly for lack of prejudice, this is the only claim that fails for this reason and it therefore cannot contribute to a larger claim of cumulative prejudice resulting from

multiple similar claims. Accordingly, Appellant's final sub-claim in Issue I regarding cumulative errors is without merit.

\* \* \*

As all of Appellant's twenty-three sub-issues in Issue I are meritless and as Appellant waived Issues II and III, we conclude that the PCRA court did not err by granting Attorney Patterson's petition to withdraw, see Commonwealth v. Freeland, 106 A.3d 768, 774-75 (Pa. Super. 2014), and we affirm the order dismissing Appellant's petition filed under the Post Conviction Relief Act.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2017